# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

DEBORAH KAY ROBERTS and LOWELL WAYNE ROBERTS

         *Plaintiffs,*

vs.

BOYD SPORTS, LLC

         *Defendant*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO: 3:23-CV-137

JURY DEMAND

## COMPLAINT

Plaintiffs Deborah Kay Roberts and Lowell Wayne Roberts, through counsel, submit the following complaint against Defendant Boyd Sports, LLC ("Boyd Sports").

## PARTIES

1. Plaintiffs, husband and wife, are citizens and residents of Lake Waynoka, Brown County, Ohio.

2. Defendant Boyd Sports, LLC is an entity organized under the laws of Tennessee with its Principal Office at 3540 Line Dr, Kodak, TN

37764-1512. Upon information and belief, Randy Boyd is the sole member and owner of Boyd Sports, LLC. Boyd Sports may be served with process on its Registered Agent, Leonidas C. Stair IV at 116 Agnes Rd, Knoxville, TN 37919-6306.

3. Randy Boyd is a citizen and resident of Knox County, Tennessee. No member or owner of Boyd Sports, LLC is a citizen or resident of Ohio where Plaintiffs reside.

4. Defendant Boyd Sports, LLC owns the Tennessee Smokies minor league baseball team and conducts business under the active assumed name of "Tennessee Smokies Baseball." Defendant Boyd Sports, LLC formerly conducted business under the assumed name "SPBC, LLC."

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff and Defendant.

6. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to

the claim occurred in this District and because Defendant conducts substantial business in this District.

## FACTUAL BACKGROUND

### a. The Foul Ball Incident.

7.     On April 20, 2022, at approximately 7:00 p.m., Plaintiff Deborah Roberts was seated in the stands of Smokies Stadium, located at 3540 Line Dr, Kodak, TN 37764 (the "Premises"), watching a minor league baseball game between the Tennessee Smokies (the "Smokies") and the Rocket City Trash Pandas when she was struck in the face by a line-drive foul ball (the "Incident").

8.     The foul ball smashed into Ms. Roberts' head, fracturing her nose and face in multiple places.

9.     Among other treatment, Ms. Roberts was immediately taken to the emergency room at LeConte Medical and then transferred to UTK Medical Center where she was admitted for three days. The following week, after she had returned home to Ohio, Ms. Roberts underwent a major facial reconstruction surgery at UC Health Medical Center. The surgery was performed under general anesthesia and required the

placement of brackets and elastic wires to secure her jaw, as well as screws, wires, and plates to secure her facial bones.

10.     Following the surgery, Ms. Roberts saw a dentist for tooth misalignment issues and an ophthalmologist for blurry vision and eye dryness. On September 28, 2022, she underwent a second facial surgery to repair deformities to her eyelid and cheek. That surgery required a fat graft from Ms. Roberts' right thigh to her right cheek.

11.     The medical treatment Ms. Roberts has required as a result of being struck in the head by the foul ball has resulted in medical bills in excess of $105,000 and she has experienced significant and ongoing severe pain and suffering as a result of her injuries.

12.     Mr. Roberts was present and sitting with his wife at the time she was violently struck in the head by the foul ball and contemplated the relationship between their purchased seats, the absence of any safeguards from foul balls and his wife's injuries as efforts were made to assist her and, as a result, experienced emotional distress.

13.     In the months following the Incident, Ms. Roberts was unable to perform her usual household services. During this time, Mr. Roberts helped care for his wife.

**b. The Lack of Protective Netting Beyond the End of the Dugouts at Smokies Stadium.**

14.     At the time of Incident, Boyd Sports owned and operated the Smokies. The Smokies are the AA minor league baseball affiliate for the Chicago Cubs.

15.     At the time of the Incident, Boyd Sports leased, occupied, managed, and/or controlled the Premises, having contracted to do so with the owners of the Premises.

16.     At the time of the Incident, the City of Sevierville and Sevier County jointly owned the Premises.

17.     The lease and management agreements for the Premises – the Smokies current stadium in Sevierville – expires in March 2025. The lease agreement is attached as Exhibit A. The management agreement is attached as Exhibit B.

18.     Per Section 3.2 of the management agreement,, "should Manager [Defendant Boyd Sports] determine its reasonable judgment that services, repairs or maintenance need to be provided or done to, on, or in the Stadium in order to … (iii) avoid or reduce risks of public harm or injury, then Manager [Defendant Boyd Sports] shall immediately,

without necessity of prior notice to the Authorized Owners Representative, proceed to undertake or arrange for qualified persons to undertake such services, repairs, or maintenance as soon as reasonably practicable and shall notify the Authorized Owners Representative thereof as soon as possible under the circumstances."

19. At the time of the Incident, Defendant retained possession and control of the Premises, including the field-level seating beyond the third-base dugout where Ms. Roberts was seated when she was struck by the foul ball.

20. At all relevant times, Defendant retained the right to enter the Premises for purposes of inspection, maintenance, or repairs.

21. At the time of the Incident, Defendant provided protective netting in front of field-level seating behind home plate and to the end of the dugouts (Sections 105-114 of Smokies Stadium). The protective netting did not extend beyond the dugouts along the first- or third-base lines.

22. At the time of the Incident, Plaintiffs were seated Section 116 Row 1 – the front row of field-level seating beyond the third-base dugout. Plaintiffs' seats lacked any protective netting.

23. At the time of the Incident, Defendant designed, built, maintained, operated, controlled, contracted, sponsored, and regulated the Premises without providing any protective netting for field-level seating beyond the dugouts.

24. Plaintiffs' seats were approximately 20 feet from fair territory of the playing field and less than 120 feet from home plate.

25. Field-level seating beyond the third-base dugout, where Ms. Roberts was seated, poses an unreasonably high risk of foul-ball injury to spectators.

26. Field-level seating beyond the third-base dugout, where Ms. Roberts was seated, is one of the most dangerous areas of Smokies Stadium, posing the highest risk of a foul-ball injury to spectators as compared to other areas of the stadium.

27. Field-level seating beyond the third-base dugout poses an unreasonably high risk of injury to spectators and is one of the most dangerous areas of Smokies Stadium because of the design and construction of Smokies Stadium whereby spectators are very close to the field of play, as well as the increased speed and frequency with which modern professional baseball players hit foul balls into this area.

28.     Prior to the Incident, at least one spectator seated in field-level seating beyond the third-base dugout had been struck by a foul ball at Smokies Stadium.[1]

29.     In 2015 or earlier, the Smokies installed protective netting behind home plate and to the end of the dugouts to prevent spectators from the risk of foul-ball injuries.

30.     Prior to the incident, on May 30, 2019, during a Major League Baseball ("MLB") game at Minute Maid Park in Houston, Cubs outfielder Albert Amora, Jr. – who played for the Tennessee Smokies from 2014-2015 – hit a foul ball 106.3 mph down the third-base line into field level seating just beyond the dugout where there was no protective netting.[2] The ball took just 1.2 seconds to travel 158 feet where it struck a four-

---

[1] *See* Marcus Fitzsimmons, A night at the ballpark: getting away to the Smokies sometimes means baseball, The Daily Times, June 3, 2015, https://www.thedailytimes.com/sports/a-night-at-the-ballpark-getting-away-to-the-smokies-sometimes-means-baseball/article_6f012be7-3262-5f2b-b5fe-2d47cb63ec48.html ("On this night, [a baseball] lining foul up left did catch a fan unaware and the park staff and usher were immediately present to make sure they were OK and offer assistance if needed").

[2] Joshua W. Praw, *Nothing But Net: Is the "Baseball Rule" About to Change?*, USLAW Magazine+, July 25, 2019, at 3, http://www.murchisonlaw.com/news_center/1117-nothing-but-net-baseball-rule-about-change.

year-old girl.[3] The girl was sitting in field-level seating beyond the third-base dugout at Minute Maid Park – the same area that Ms. Roberts was sitting at Smokies Stadium.

31. The next day, on May 31, 2019, Tennessee Smokies General Manager Tim Volk acknowledged the "importance of netting" to protect spectators in the unprotected areas of Smokies Stadium from foul-ball injuries:

> That's the thing, it's 105 mph is what it came off the bat as and it's so hard to react to something like that, which goes back to the importance of the netting, it's hard for even a professional baseball player to react to a 105-mph ball let alone someone in the stands.[4]

32. In August 2019, U.S. Senators Duck Durbin (Ill.) and Tammy Duckworth (Ill.) wrote to MLB Commissioner Rob Manfred, requesting that all MLB teams be required to extend protective netting beyond the dugouts to the right- and left-field corners at their ballparks.[5]

---

[3] *Id.*

[4] Gabriella Pagán, *Tennessee Smokies Highlight Ballpark Safety After Houston Girl Gets Hit by Foul Ball*, ABC NEWS CHANNEL 6, May 30, 2019, https://www.wate.com/news/local-news/tennessee-smokies-highlight-ballpark-safety-after-houston-girl-gets-hit-by-foul-ball/.

[5] Phil Rosenthal, *U.S. Senators Dick Durbin and Tammy Duckworth ask MLB Commissioner Rob Manfred for more data on ballpark fan injuries*, CHI. TRIBUNE, August 7, 2019, https://www.chicagotribune.com/sports/breaking/ct-protective-netting-

33.    In October 2019, an NBC News investigation discovered at least 808 reports of serious foul-ball injuries (requiring hospitalization) from 2012 to 2019 at MLB stadiums, an average of 27 per MLB stadium.[6] The injuries included concussions, permanent vision loss, and death.[7] Multiple foul-ball injuries occurred in field-level seating beyond the third-base dugout at these MLB stadiums.

34.    In December 2019, Commissioner Manfred required all MLB teams to extend protective netting "substantially beyond the end of the dugout" for the 2020 season.[8]

35.    Following this mandate and prior to the Incident, several minor league baseball teams began extending or adding protective netting beyond the dugouts along the first- and third-base lines at their stadiums, including, but not limited to:

- Charlotte Knights (Class AAA; International League)

dick-durbin-tammy-duckworth-20190807-2vf5m6lusjb7jlbn6x72ftn4ki-story.html.

[6] Michelle Tak, Vicky Nguyen, Joe Enoch, and Andrew W. Lehren, *Foul balls hurt hundreds of fans at MLB ballparks. See where you team stands on* netting, NBC NEWS, Oct. 1, 2019, https://www.nbcnews.com/news/sports/we-re-going-need-bigger-net-foul-balls-hurt-hundreds-n1060291.

[7] *Id.*

[8] *Id.*

- The Lehigh Valley IronPigs (Class AAA; International League)
- Memphis Redbirds (Class AAA; International League)
- Reno Aces (Class AAA; Pacific Coast League)
- New Orleans Baby Cakes (Class AAA; Pacific Coast League)
- Iowa Cubs (Class AAA; Pacific Coast League, AAA affiliate of the Chicago Cubs)
- Fresno Grizzlies (Class AAA; Pacific Coast League)
- Salt Lake Bees (Class AAA: Pacific Coast League)
- Tulsa Drillers (Class AA; Texas League)
- Hartford Yard Goats (Class AA: Eastern League)
- Northwest Arkansas Naturals (Class AA: Texas League)
- Pensacola Blue Wahoos (Class AA: Southern League)
- Wilmington Blue Rocks (High A; Carolina League)
- Winston-Salem Dash (High A; Carolina League)
- Delmarva Shorebirds (Low A; Sally League)
- Kane County Cougars (Low A; Midwest League)
- Cleburne Railroaders (Independent; American Association)
- Somerset Patriots (Independent; American Association).

36.    Following this mandate and prior to the Incident, the Iowa Cubs installed protective netting beyond the dugouts at its stadium. The Iowa Cubs are the AAA affiliate of the Chicago Cubs. The Smokies are the AA affiliate of the Chicago Cubs.

37.    Following this mandate and prior to the Incident, the Memphis Redbirds installed protective netting beyond the dugouts at its stadium.

38.     Defendant Boyd Sports, LLC and/or its member Randy Boyd has an ownership stake in the Memphis Redbirds, a AAA minor league baseball team.

39.     At the time of the Incident, in April 2022, a clear majority of the 120 minor league baseball teams had protective netting beyond the dugouts along the first-base and third-base lines at their stadiums. For the 2022 season, a research survey conducted by FoulBall SafetyNow.com found that of the 120 minor league baseball teams only 44 minor league teams (including the Tennessee Smokies) did not have netting beyond the dugouts along the first and third base lines at their stadiums.[9]

40.     At the time of the Incident, Defendant's stadium was therefore one of a small minority of AA minor league baseball stadiums lacking protective netting beyond the dugouts. In the eight team Southern League (the league in which the Tennessee Smokies play):

- The Pensacola Blue Warriors extended netting from the end of the dugouts to the foul poles in April 2022.[10]

---

[9] https://www.foulballsafetynow.com/research (May 2022).
[10] https://www.milb.com/news/blue-wahoos-city-of-pensacola-extend-safety-netting-at-blue-wahoos-stadium

- The Birmingham Barons extended protective netting at Regions Field prior to the 2020 season down both base lines.[11]
- The Mississippi Braves have netting beyond the dugouts to the foul lines since 2019.[12]
- The Rocket City Trash Pandas extended netting to the foul lines for 2022 season.[13]
- The Chattanooga Lookouts extended netting to the foul poles for the 2022 season.[14]
- The Montgomery Biscuits extended netting to the foul poles in 2017 after a serious eye injury to a woman from a foul ball in 2016.[15]
- Only the Tennessee Smokies and the Birmingham Barons lacked foul ball screening to the foul lines in the Southern League at the time of Mrs. Roberts' injury in 2022.[16]

---

[11] https://ballparkdigest.com/2020/02/24/birmingham-barons-announce-regions-field-upgrades/

[12] https://www.milb.com/mississippi/tickets/tickets-seating-chart; https://www.wlbt.com/2019/06/14/fans-hit-by-foul-balls-lead-talks-extended-nets/: "After some injuries from baseballs and bats that flew into the stands, it had to extend to the far end of both dugouts. Fans are creatures of habit and want to watch baseball a certain way, and there was a little pushback at first," said Mississippi Braves general manager Pete Laven. "But it was almost immediately the realization took place that the precaution was good for the game and they got used to that almost immediately so that wasn't too big of a transition for the fans. They got accustomed to it pretty quick."

[13] https://www.milb.com/rocket-city/news/new-at-toyota-field-in-2022

[14] Personal telephone communication to Chattanooga Lookout (April 17, 2023).

[15] https://www.wsfa.com/story/36214020/woman-returns-to-watch-the-montgomery-biscuits-after-suffering-serious-injury/; https://drmiraculous.blogspot.com/2017/02/biscuits-get-new-owner-and-protective.html

[16] See footnotes 10-14 and https://www.foulballsafetynow.com/research (May 2022).

41.     In August 2020, around the time when other minor league baseball stadiums were extending netting beyond the dugouts, the owner of Defendant Boyd Sports, Randy Boyd, announced a plan for a $142 million mixed-use development in Knoxville's Old City area, anchored by a new ballpark for the Smokies.[17]

42.     The original estimated cost for the new stadium complex was $65 million. On March 23, 2023, Mr. Boyd released a finalized funding plan that put the final Guaranteed Maximum Price for the stadium complex at $114 million.[18]

43.     In December 2022 (seven months after the Incident), the MLB required all minor league parks to install netting beyond the dugouts from foul pole to foul pole by 2025.[19]

---

[17] Kevin Richard, *Boyd Unveils New Vision For Knoxville Park*, BALLPARKDIGEST.COM, August 11, 2020, https://ballparkdigest.com/2020/08/11/boyd-unveils-vision-for-new-knoxville-ballpark/

[18] Gregory Raucoles and Molly O'Brien, *Cost of downtown Knoxville Smokies stadium balloons to $114 million*, ABC NEWS CHANNEL 6, March 23, 2023, https://www.wate.com/news/top-stories/cost-of-downtown-knoxville-smokies-stadium-balloons-to-114-million/#:~:text=(WATE)%20%E2%80%93%20%24114%20million%E2%80%94,the%20project%20won't%20change.
[19] Matt Martell, *MLB Passes Protective Netting Requirements at Minor League Ballparks*, SPORTS ILL., December 7, 2022,

44.    Upon information and belief, the Smokies new stadium in Knoxville will have protected netting beyond the dugouts.

45.    At the time of the Incident, Defendant knew or should have known that spectators at major league and minor league baseball games in field-level seating beyond the dugouts and close to the playing field were inadequately protected from foul balls and exposed to an unreasonably high risk of injury if such seats lacked protective netting.

46.    At the time of the Incident, Defendant knew or should have known that the industry standard for professional baseball parks required protective netting for field-level seating beyond the dugouts.

47.    Despite knowing that other minor league baseball teams were extending protective netting beyond the dugouts at their stadiums, including the Iowa Cubs (a fellow affiliate of the Chicago Cubs) and the Memphis Redbirds (a minor league team partially owned by Defendant Boyd Sports, LLC and/or its member Randy Boyd), Defendant chose not to do so.

---

https://www.si.com/mlb/2022/12/08/extended-netting-minor-leagues#:~:text=Major%20League%20Baseball%20will%20require,announced%20in%20a%20statement%20Wednesday.

48.    Despite knowing that spectators in field-level seating beyond the dugouts were inadequately protected from foul balls, Defendant chose not to add protective netting beyond the dugouts at Smokies Stadium because the Smokies were going to have a new stadium in Knoxville in a couple years when the term of applicable management and lease agreements ended.

49.    Upon information and belief, Defendant had access to technology that tracks the frequency and exit velocity of foul balls such that Defendant knew or should have known that spectators at Smokies Stadium in field-level seating beyond the dugouts and close to the playing field were inadequately protected and exposed to an increased risk of harm from foul balls if such seats lacked protective netting.

50.    Defendant knew or should have known that failing to provide protective netting to field-level seating beyond the dugouts at Smokies Stadium was unsafe, unreasonably dangerous, and violative of industry standards applicable to professional baseball stadiums.

51.    At the time of the incident, Defendant did not provide spectators, including Ms. Roberts, with any warning by means of tickets,

signs, verbal warnings or otherwise regarding the risk of foul-ball injuries at the Premises.

52.    At the time of the incident, Defendant did not provide any spectators, including Ms. Roberts, with any warning by means of tickets, signs, verbal warnings or otherwise regarding the increased risk of foul-ball injuries posed to spectators in the field-level seating where there was no protective netting.

53.    At the time of the Incident, the demand for protective netting for beyond the dugouts at professional baseball stadiums, including Smokies Stadium, was high from fans and players. Defendant knew or reasonably should have known that the number of seats behind protective screening at Smokies Stadium was insufficient or inadequate to accommodate the demand for such seats.

54.    When Ms. Roberts called the Smokies to purchase tickets for the subject game, the salesperson selected four seats for Ms. Roberts and told her to pick up the tickets at will call. The salesperson never mentioned that the seats lacked protective netting or that the Smokies offered seating behind home plate and the dugouts that did have protective netting.

55.    Since the tickets were sold on a reserved basis, Ms. Roberts did not have an opportunity upon entering the stadium to select a seat with protective netting.

56.    The presence of netting behind home plate to the end of the dugouts, but not beyond the dugouts, gave spectators in the unprotected field-level seating, such as Ms. Roberts, a false sense of security that watching the game in those seats, beyond the protective netting, was safe.

57.    The Premises presented risks to spectators, including Ms. Roberts, beyond those inherent to the sport of baseball by including non-necessary distractions, including, but not limited to, a large scoreboard behind the leftfield berm, showing player pictures, interactive sequences, and real-time stats; and seats close enough to the playing field that spectators could strike up conversations with players in the bullpen.

58.    The Premises presented risks to spectators, including Ms. Roberts, beyond those inherent to the sport of baseball by offering distracting in-game entertainment and encouraging fans to use their cell phones during the game to post pictures to social media accounts using

stadium promoted hashtags like #SmokiesBaseball, #CubTogether, and #ItsDifferentHere.

59. The Premises presented risks to spectators, including Ms. Roberts, beyond those inherent to the sport of baseball by offering unprotected seats very close to the field of play, reducing spectators' time and ability to react to foul balls.

60. The Premises presented risks to spectators, including Ms. Roberts, beyond those inherent to the sport of baseball because it was designed, built, maintained, operated, controlled, contracted, sponsored, selected, and regulated in a manner that exposed spectators to an increased and unreasonably high risk of injury from foul balls.

61. These non-necessary distractions and increased risks to spectators, such as Ms. Roberts, are not inherent to the sport of baseball, but rather are intended to entice more fans, market the game, and increase revenue. These additions could reasonably be expected to divert the attention of spectators from the field of play and reduce reaction time to foul balls entering the spectator seating area.

62. Ms. Roberts did not accept the risks caused by the increased risks to spectators beyond those inherent in the sport of baseball.

63. Given Defendant's knowledge of these non-necessary distractions and the increased frequency and velocity with which modern professional baseball players hit foul balls into field-level seating beyond the dugouts, Defendant failed to take precautions that a reasonably prudent business owner or operator would have taken to ensure that a dangerous and hazardous condition did not exist on its premises.

## NEGLIGENCE OF DEFENDANT

64. Plaintiffs incorporate all above paragraphs.

65. As the occupier, operator, and manager of the Premises, Boyd Sports had a duty to exercise reasonable care to protect persons legally on the Premises from unreasonable risks of harm. The risk of foreseeable injury from foul balls hit along the first and third base line was well-recognized in 2022 and a lack of netting along the foul lines (to the foul poles) was not consistent with the standard existing in the Southern League (or in a clear majority of minor league professional baseball stadiums."[20]

---

[20] *See Fisher v. Metro. Gov't of Nashville*, No. 01-A-01-9609-CV00402, 1997 WL 80025, at *2 (Tenn. Ct. App. Feb. 26, 1997)(In finding a legal duty owed to a spectator injured from a hockey puck in an unscreened area  the Court noted: "The 20 foot gap with no plexiglass between the players boxes in Municipal Auditorium was not consistent with the

66. Defendant's duty to exercise reasonable care included maintaining the premises in a reasonably safe condition either by removing or repairing potentially dangerous conditions or by helping patrons and guests avoid injury by warning them of the existence of dangerous conditions.

67. Defendant was responsible for inspecting, maintaining, regulating, and supervising the safety and protection of the Premises, including the area where Ms. Roberts was seated at the time of the Incident.

68. Defendant was responsible for monitoring, assessing, or determining the nature of the risk posed to spectators in the area where

standard existing in most all professional hockey arenas."); *see also Justus v. Wood*, 209 Tenn. 55, 74, 349 S.W.2d 793, 794 (1961)

> Foreseeability cases of this kind cannot be summarily rejected. The degree of risk or likelihood that such car would be taken will vary with circumstances, such as the time and place where the car is left, the section of the city, the kind of neighborhood, etc. 'The risk reasonably to be perceived defines the duty to be obeyed, * * *.' *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99, 100, 59 A.L.R. 1253 (Cardozo, J.). *See also* 2 Restatement, Torts, § 302(b), 303.

Ms. Roberts was seated. This included the responsibility of adequately tracking and monitoring the frequency and velocity with which players were hitting foul balls into certain areas of the stadium and the extent to which spectators were distracted by distractions and non-game-related entertainment offerings at the stadium.

69. The Tennessee Supreme Court has held that both primary and secondary implied assumption of the risk are not recognized under Tennessee law as bars to recovery. *Perez v. McConkey,* 872 S.W.2d 897, 899 (Tenn. 1994). Instead, even where a plaintiff "assumes a known risk," Tennessee courts will apply a common-law duty analysis and principles of comparative fault. *See id.*; *Fisher v. Metropolitan Government of Nashville*, 1997 WL 800245, *1 (Tenn. Ct. App. 1997) (holding that a hockey arena breached its duty to protect spectators from errant pucks).

70. At all relevant times, it was foreseeable that spectators seated in the area where Ms. Roberts was seated could be struck by a foul-ball; and Defendant was on notice of the likelihood of danger and increased risk of harm of foul-ball injuries to such spectators.

71. At all relevant times, it was feasible and not overly burdensome for Defendant to have engaged in safer, alternative conduct

by extending protective netting far enough to protect spectators or warning about the dangers posed by sitting in seats beyond the dugouts that lacked any protective netting.

72. Defendant breached its duty to exercise reasonable care under the circumstances by:

i. Failing to protect Ms. Roberts, who was seated in field-level seating beyond the dugouts, from the foreseeable risk of a foul-ball injury.

ii. Failing to extend protective netting far enough beyond the dugouts to adequately protect Ms. Roberts from the foreseeable risk of foul-ball injury.

iii. Failing to extend protective netting to all areas of the stadium that Defendant knew or should have known posed the greatest risk of a foul-ball injuries to spectators, including the area where Ms. Roberts was seated.

iv. Failing to comply with industry standards for minor league professional baseball parks, which required the installation of protective netting in the area where Ms. Roberts was seated.

v. Permitting the field-level seating beyond the dugouts where Ms. Roberts was seated to remain in an unsafe and unreasonably dangerous condition.

vi. Negligently electing to install protective netting only to certain areas of the stadium (e.g. behind home plate and to the end of the dugouts).

vii. Failing to warn Ms. Roberts of the increased risk of a foul-ball injury at Smokies Stadium and the increased risk of a foul-ball injury to spectators seated in the area where Ms. Roberts was seated.

viii. Negligently giving spectators, including Ms. Roberts, a false sense of security that watching the game in field-level seating beyond the protected areas would be safe.

ix. Negligently relying on fans seated very close to the action to protect themselves from injury, when even fans paying extremely close attention to action on the field have virtually no chance of avoiding injury.

x. Increasing the risk of harm to spectators from foul balls by creating unnecessary distractions at the stadium and providing seats dangerously close to the playing field.

xi. Failing to monitor, assess, or determine the unreasonable nature of the risk posed to spectators in the area where Ms. Roberts was seated.

xii. Failing to adequately track or monitor the frequency and velocity with which players were hitting foul balls into the area of the stadium where Ms. Roberts was seated.

73. Defendant also *assumed* a duty to protect spectators from the well-known and foreseeable risk of foul-ball injuries by electing to install protective netting behind home plate and to the end of the dugouts in 2015 or earlier. In failing to extend the netting beyond the dugouts, when Defendant knew or should have known that spectators were still exposed to an unreasonably high and increased risk of harm from foul-ball injuries and that industry standards required such netting, Defendant breached this assumed duty to protect spectators from foul-ball injuries.

74. Acting through its agents and employees, Defendant caused Mr. Roberts to suffer severe emotional distress. Acting through its agents and employees, Defendant was negligent, and its negligence directly, factually, legally and proximately caused Mr. Roberts to suffer severe emotional distress.

75. This emotional distress was a direct result of his awareness, witnessing and perception of the harm to his wife and contemporaneous contemplation of the relationship between the injuries and Defendant's negligence in failing to provide adequate safeguards and constitutes an injury-producing event for the purposes of a negligent infliction of emotional distress claim. *See, e.g., Henderson v. Vanderbilt Univ.*, 534 S.W.3d (Tenn. Ct. App. 2017).

76. Plaintiffs specifically plead that the above negligent infliction of emotional distress claim brought by Mr. Roberts constitutes a separate injury subject to a second, distinct "cap" of $750,000.00 for non-economic damages under T.C.A. § 29-39-102.

## DAMAGES

77. Plaintiffs incorporate all above paragraphs.

78. As a direct and proximate result of the negligence of Defendant, Ms. Roberts suffered physical injuries, pain and suffering, disfigurement, physical impairment, and the loss of enjoyment of life.

79. As a direct and proximate result of the negligence of Defendant, Ms. Roberts has incurred medical expenses of at least $105,000 as well as out-of-pocket expenses.

80.     As a direct and proximate result of the negligence of Defendant, Mr. Roberts has experienced a loss of spousal consortium pursuant to Tenn. Code Ann. § 25-1-106.

81.     As a direct and proximate result of the negligence of Defendant, Mr. Roberts experienced severe emotional distress.

82.     The conduct of Defendant Boyd Sports as described above demonstrates intentional, reckless, or willful misconduct and/or an entire want of care to raise a presumption of conscious indifference to consequences constituting recklessness and thus warranting the imposition of punitive damages in an amount to be set by the jury, to deter such conduct in the future and punish Boyd Sports.

83.     Plaintiffs further assert all available damages under applicable law.

### PRAYER FOR RELIEF

84.     Plaintiffs pray for relief as follows:

i.  That process be issued requiring Defendant to answer this Complaint in the manner and within the time prescribed by law;

ii. For fair and reasonable compensatory damages determined by the jury;

iii. For the court costs of trying this action;

iv. For a jury to hear this cause of action;

v. For costs to be taxed to Defendant;

vi. For such other and further relief as the Court may deem proper; and

vii. Such other and further relief to which Plaintiffs may be entitled.

85. Plaintiffs respectfully reserve the right to amend this Complaint to conform to the evidence.

Respectfully submitted,

DRS LAW

*/s/ David Randolph Smith*
David Randolph Smith, TN BPR#011905
Dominick R. Smith, TN BPR # 028783
W. Lyon Chadwick, TN BPR # 029599
Christopher W. Smith, TN BPR #034450
1913 21st Avenue South
Nashville, Tennessee 37212
(615) 742-1775 phone
(615) 742-1223 fax
drs@drslawfirm.com
*Attorneys for Plaintiff*